* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms with modifications the Opinion and Award of Deputy Commissioner Harris and enters the following Opinion and Award:
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Commission has jurisdiction over this matter. *Page 2 
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated, and there is no question as to joinder or non-joinder of parties.
4. Insurance coverage existed on the date of injury in this claim and Liberty Mutual Insurance Company is the carrier on the risk.
5. Plaintiff sustained a compensable injury on December 22, 2004.
6. An employment relationship existed between Plaintiff and Defendant-Employer at all of the relevant times.
7. Plaintiff's average weekly wage in this claim is $598.89.
8. Plaintiff has been paid compensation consisting of $399.28 per week since the date of injury.
 * * * * * * * * * * *
The following were submitted to the Deputy Commissioner as Stipulated Exhibits:
 EXHIBITS
• Exhibit 1: Executed Pre-Trial Agreement
• Exhibit 2: Industrial Commission Forms and filings
• Exhibit 3: Surveillance report (including 5/25/10 report submitted post-hearing)
• Exhibit 4: Plaintiff's medical records
• Exhibit 5: Job description
• Exhibit 6: DVD of surveillance footage
The following documents were submitted by Plaintiff with his Contentions, were not objected to by Defendants, and were received by the Deputy Commissioner as Plaintiff's exhibits: *Page 3 
• Plaintiff's Exhibit 1: Interpretative report of vocational interests for Plaintiff dated 9/19/08
• Plaintiff's Exhibit 2: Vocational assessment report dated 10/2/08
Transcripts of the depositions of the following were also received by the Deputy Commissioner:
• Dr. Richard S. Broadhurst (with Defendants' Exhibit 1)
• Dr. Dom Coric (with Plaintiff's Exhibit 1)
• Scott Crane
 * * * * * * * * * * *
As set forth in the Pre-Trial Agreement and Deputy Commissioner Harris' January 3, 2011 Opinion and Award, the Full Commission addresses the following:
 ISSUES
1. Whether Plaintiff remains disabled?
2. Whether Defendants' Form 24 application should have been approved?
3. Whether Plaintiff is entitled to further medical treatment, specifically including CT myelograms recommended by Dr. Coric?
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 46 years old, with a date of birth of February 20, 1965. He completed high school in American Samoa in 1983 and has no further formal education. He came to the mainland and worked for a tree service in California from 1983 to 1986. Before starting with *Page 4 
Defendant-Employer, Plaintiff also worked as a "cloth spreader" and as a yard man in a lumber yard.
2. Plaintiff started working for Defendant-Employer as a tree trimmer in 2001.
3. Plaintiff is a large man and appears to have a muscular build.
4. On December 22, 2004, Plaintiff was on a job in Georgia and fell from a height of 10 to 15 feet from a cherry picker. He fractured five ribs in the fall. After the accident, Plaintiff also complained of pain in his neck, low back, and both shoulders.
5. Defendants accepted this claim as compensable for "5 cracked ribs" via a Form 60 dated January 15, 2007. Defendants have never formally accepted any other injuries as compensable in this claim.
6. Plaintiff has not worked since December 22, 2004, and Defendants have paid him temporary total disability ("TTD") compensation since that time.
7. Plaintiff has received extensive medical attention since the accident.
8. The first specialist Plaintiff saw after the accident was Dr. Bruce Nixon, a neurosurgeon in Georgia. Plaintiff presented to him on January 31, 2005, complaining of pain in his neck, head, back, and both shoulders. Dr. Nixon recommended MRIs of Plaintiff's spine to rule out a spinal cord injury, and Plaintiff underwent cervical, thoracic, and lumbar MRIs on February 11, 2005.
9. Dr. Nixon reviewed the MRIs on February 14, 2005. He noted a disk osteophyte complex at C5-6 with compression of the cord. The thoracic MRI showed degenerative changes without cord compression. The lumbar MRI showed degenerative changes without acute pathology. Dr. Nixon noted that Plaintiff might require anterior cervical decompression and fusion at C5-6. *Page 5 
10. Plaintiff returned to Dr. Nixon on March 10, 2005, with complaints of neck pain with pain radiating down into his right arm and numbness and tingling in his right hand. He was told to consider surgery.
11. Dr. Nixon referred Plaintiff to Dr. Todd Stewart for a cervical epidural steroid injection, which Plaintiff underwent on March 28, 2005.
12. On follow-up with Dr. Nixon on April 18, 2005, Plaintiff reported that his right arm pain had improved with the injection, and his main problems at that time were his right shoulder and low back pain. Dr. Nixon recommended a right shoulder MRI. He felt that Plaintiff was capable of moderate duty work.
13. On May 2, 2005, Dr. Nixon stated that Plaintiff was at maximum medical improvement for his rib fractures. Dr. Nixon felt that Plaintiff's neck and right arm symptoms were related to disk disease at C5-6 and that he might benefit from surgery. He reiterated that Plaintiff should consider cervical surgery.
14. Plaintiff was then sent to Drs. Jay Bender and Michael Kalson, who are orthopedists in Georgia. Plaintiff saw Dr. Bender on June 10, 2005, and he recommended repeat lumbar and cervical MRIs, which Plaintiff underwent on June 27, 2005. Dr. Bender noted that the cervical MRI showed a herniated disk at C5 compressing the thecal sac and that the lumbar MRI showed L4-5 disk desiccation. Dr. Bender recommended continued conservative treatment and took Plaintiff out of work.
15. Thereafter, Dr. Bender recommended a series of lumbar epidural steroid injections to address Plaintiff's complaints of low back and right leg pain. Dr. Bender administered two injections in August and September 2005, but Plaintiff reported they did not help. Dr. Bender recommended a surgical consultation with Dr. Kalson. *Page 6 
16. Dr. Kalson evaluated Plaintiff on September 29, 2005. Dr. Kalson noted that Plaintiff had aggravated his pre-existing degenerative disk disease and recommended continued conservative treatment.
17. On November 3, 2005, Dr. Kalson recommended diskograms at L2-3, L3-4, and L4-5. He noted that disk replacement might be an option if Plaintiff were positive at L4-5.
18. Plaintiff had the diskograms and CT scan on November 28, 2005. Dr. Kalson noted that the only level to produce pain was L4-5. He opined that Plaintiff was a candidate for either disk replacement or anterior lumbar fusion at L4-5, and Plaintiff was to consider that option.
19. Plaintiff returned to Dr. Kalson on February 23, 2006, with complaints of low back and neck pain. He told Dr. Kalson that he would not make any surgical decisions until he had received a second opinion.
20. Plaintiff had an independent medical examination with Dr. Sean Keem, an orthopedic surgeon in Georgia, on March 16, 2006. Dr. Keem agreed with Dr. Kalson's surgical recommendation, although he felt that the source of Plaintiff's low back pain needed further delineation. Dr. Keem also recommended cervical decompression at C3-4, C4-5, and C5-6. He recommended sedentary work restrictions.
21. After a delay in treatment of over one year, Defendants sent Plaintiff to Dr. James Hoski, an orthopedic spine surgeon in Asheville. Plaintiff presented to him on April 17, 2007, with a main complaint of low back pain radiating into both legs. Dr. Hoski did not recommend lumbar surgery for Plaintiff. He recommended a repeat cervical MRI.
22. Plaintiff underwent the repeat cervical MRI on May 1, 2007. Dr. Hoski read the MRI as showing degenerative changes at C3-4, C4-5, C5-6, and C6-7, with a paracentral disk herniation at C5-6 that flattened the left side of the cord with left C6 neuroforaminal stenosis. Dr. Hoski recommended a neurosurgical consultation. *Page 7 
23. Plaintiff saw Dr. Harold Pikus, a neurosurgeon, on June 27, 2007. Dr. Pikus reviewed the MRIs and noted that the C5-6 disk abnormality was significantly worse in 2005 than it was in 2007.
24. Plaintiff had another cervical MRI on August 23, 2007. He returned to Dr. Pikus the next day and reported that his symptoms were getting worse. Dr. Pikus recommended a myelogram and post-myelogram CT of the cervical and lumbar spine, both of which Plaintiff underwent on September 14, 2007.
25. Plaintiff returned to Dr. Hoski on October 5, 2007. Dr. Hoski noted that the lumbar scan showed degenerative changes in the lumbar spine, but no evidence of nerve root compression. He further noted that the cervical scan showed a left-sided spur at C5-6 and possible foraminal stenosis in the nerve root sheath. Dr. Hoski did not think that Plaintiff had spinal cord compression, and he opined that the only symptoms he could have related to his cervical condition would be down his left arm. Dr. Hoski did not think that surgery had a substantial likelihood of success in relieving Plaintiff's symptoms, and he recommended referral to a pain management specialist.
26. Also on October 5, 2007, Dr. Hoski opined that the main barrier to a return to work for Plaintiff was pain control. He assigned a five percent (5%) permanent partial impairment rating to Plaintiff's back and assigned permanent work restrictions of no lifting more than 20 pounds, no pushing or pulling over 50 pounds, and only occasional bending, stooping, twisting, and climbing. *Page 8 
27. Plaintiff was in a motor vehicle accident on July 6, 2008. There is no evidence in the record to show that this accident contributed in any significant way to any of Plaintiff's ongoing long-term neck and low back symptoms.
28. After another delay in treatment of over one year, Defendants sent Plaintiff to Dr. Broadhurst, an occupational medicine practitioner at the Center for Occupational Rehabilitation ("COR") in Asheville. Plaintiff presented to Dr. Broadhurst on January 7, 2009. Among other diagnoses, Dr. Broadhurst assigned the following to Plaintiff: cervical degenerative disk disease and stenosis, lumbar degenerative disk disease, thoracic degenerative disc disease, and somatoform pain disorder. Dr. Broadhurst felt that Plaintiff did not have any significant residual conditions related to his December 22, 2004 accident, but rather felt that Plaintiff's symptoms were due to deconditioning and somatization. Dr. Broadhurst recommended work hardening at COR and a psychological evaluation with Dr. Terence Fitzgerald, a psychologist at COR. Dr. Broadhurst further stated that if Plaintiff chose not to participate in work hardening, then he would be at maximum medical improvement, and the work restrictions assigned by Dr. Hoski would be permanent.
29. Plaintiff returned to Dr. Broadhurst on February 23, 2009. Plaintiff reported that he did not want to participate in work hardening until he was seen for a second opinion by a spine surgeon. Plaintiff had been on long-term narcotics, and Dr. Broadhurst continued to prescribe Oxycodone and morphine. By this time, Plaintiff was using a cane on his right to walk when he came in to see Dr. Broadhurst.
30. Plaintiff thereafter continued to see Dr. Broadhurst periodically. Plaintiff would typically present as hunched over on his cane, complaining of neck and low back symptoms, and pain ranging from 8/10 to 10/10. Dr. Broadhurst continued to prescribe narcotics for Plaintiff's pain and he encouraged Plaintiff to be as active as possible. *Page 9 
31. On or about June 15, 2009, Defendants filed a Form 24 application seeking termination of Plaintiff's TTD compensation on grounds that he had refused the work hardening recommended by Dr. Broadhurst. By Order filed July 10, 2009, Special Deputy Commissioner Emily M. Baucom disapproved the application because there had been no previous order directing Plaintiff to comply with medical treatment. Special Deputy Commissioner Baucom also noted that Defendants had not yet authorized the second opinion evaluation that Plaintiff wanted before he decided whether to enroll in work hardening, and she thus declined to enter an order directing Plaintiff's compliance with medical treatment. Special Deputy Commissioner Baucom also noted that either party could make a motion after Plaintiff's receipt of a second opinion evaluation.
32. On August 3, 2009, Special Deputy Commissioner Baucom filed an Order finding that Plaintiff's Motion for an independent medical examination was moot because Defendants had responded to said Motion and agreed to authorize such an evaluation.
33. On or about December 22, 2009, Defendants filed another Form 24 application, seeking termination of Plaintiff's TTD compensation on grounds that surveillance showed that Plaintiff was "exaggerating his symptoms" and was no longer disabled. On February 2, 2010, Special Deputy Commissioner Baucom filed an Order finding that the Commission could not reach a decision on the application administratively and that this matter should be referred for a full evidentiary hearing.
34. Plaintiff had a repeat cervical MRI on November 27, 2009. It showed a new annular tear and left central protrusion at C4-5 that indented the left side of the spinal cord. There was also a broad-based left central protrusion at C5-6 that flattened the left side of the *Page 10 
spinal cord slightly. The C5-6 protrusion had increased in size very slightly since the prior MRI. There was also a small midline protrusion at C6-7 that contacted the cord but did not deform it, and this condition was felt to be unchanged from the prior MRI.
35. Before the November 27, 2009 cervical MRI results, Dr. Broadhurst had not agreed with Plaintiff that he needed to see another spine surgeon. However, upon review of these latest MRI results, Dr. Broadhurst now thought it was appropriate for Plaintiff to see a neurosurgeon.
36. On March 3, 2010, Plaintiff presented to Dr. Coric, a neurosurgeon, for a second opinion evaluation regarding his spinal issues. Plaintiff's main complaint was neck pain that extended across the shoulders and all the way down his low back. He also described bilateral upper extremity pain with tingling into all five fingers on each hand and pain into both legs all the way down to his feet. On examination, Plaintiff had signs of clonus and hyperreflexia. Dr. Coric recommended cervical, thoracic, and lumbar myelograms and post-myelogram CT scans to rule out myelopathy, given the signs of clonus and hyperreflexia. Dr. Coric noted that he would not recommend surgery if there were no spinal compression.
37. Dr. Coric explained that the clonus signs he found consisted of abnormal spinal cord reflexes in both of Plaintiff's legs. He recommended the CT myelograms in order to rule out clonus, but he clarified that Plaintiff's complaints of neck and low back pain have no relationship to possible clonus. Dr. Coric further clarified that he would not have ordered the CT myelograms were it not for his findings regarding clonus.
38. Dr. Coric also noted that clonus is a thoracic spine condition and that, if Plaintiff had had a thoracic CT myelogram and/or MRI since he was initially diagnosed with clonus in 2005, then there would be no need for repeat testing. *Page 11 
39. Plaintiff did have a thoracic MRI done in February 2005 while under the treatment of Dr. Nixon, the neurosurgeon in Georgia. The MRI was read to show degenerative changes with no cord compression. Dr. Coric was satisfied that, given that result, the CT myelogram he ordered might not be necessary.
40. On May 5, 2010, Dr. Broadhurst discharged Plaintiff from his treatment after being made aware of Defendants' surveillance footage. Even before discharging Plaintiff, Dr. Broadhurst had suspected that Plaintiff might be diverting his medications but had no proof.
41. Defendants hired a private investigator to conduct surveillance of Plaintiff. The investigator spent seven, seven-hour days conducting surveillance of Plaintiff, for a total of 48.5 hours of time. Based on this surveillance, Defendants tendered into evidence approximately 45 minutes of surveillance footage, which represented the total of the time that the investigator was able to see Plaintiff during his surveillance. The 45 minutes of footage was spread over five different days.
42. On July 31, 2009, Plaintiff was filmed at his home retrieving items from the trunk of his car and carrying them inside. He lifted and carried a laundry basket with some items in it and slung a bag over his right shoulder. On a second trip, he lifted some boxes out of the trunk, held them momentarily with his left hand only while shutting the trunk lid, and then carried them with both hands. Plaintiff ducked under a clothesline as he carried the items. He was walking normally, without a cane.
43. On September 6, 2009, Plaintiff was filmed limping into an office using a cane in his right hand.
44. On September 24, 2009, Plaintiff was filmed limping into Dr. Broadhurst's office using a cane in his right hand. Later, he was filmed limping from Dr. Broadhurst's office across a *Page 12 
large parking lot (approximately one quarter of a mile), using the cane in his right hand, to a shopping mall. There, he met his wife and two children. He was later filmed coming out of the mall holding his son on his left side with his left arm. Plaintiff then put his son down and walked away from the store with him, at a brisker pace and with less of a limp, still using the cane in his right hand.
45. On November 27, 2009, Plaintiff was filmed walking away from an office in the morning after an MRI appointment, slowly limping and using the cane in his right hand. Later in the afternoon, he was filmed walking somewhat normally, with no cane. He was filmed spending a lot of time in his parked car. At about 2:45 p.m., he got out of his car (a compact model) and pushed it forward, with both hands on the driver's side door frame, up a very slight incline about 15 feet. He then hopped back into the driver's seat and appeared to pop the clutch to roll-start the car in reverse. About one minute later, he was filmed walking somewhat normally, with no cane, into a store. While doing so, he bent over at the waist to pick something up off the ground. Two minutes later, he exited the store and walked, again somewhat normally, back to his car.
46. On May 24, 2010, the day of the hearing, Plaintiff was filmed limping into the courthouse using a cane in his right hand. Later that afternoon, he was filmed at other locations, still limping and using a cane in his right hand.
47. Plaintiff knew of the possibility of his being watched as of May 24, 2010. On the other days, he was apparently not aware of that possibility.
48. There is no evidence in the record, other than Plaintiff's testimony, to establish the weights of the items that Plaintiff was filmed lifting and/or carrying. Plaintiff testified that the boxes weighed no more than 20 pounds apiece, the laundry basket about two pounds, and his son about 35 pounds at the time. Plaintiff further testified that he does not always use his cane. *Page 13 
49. Dr. Broadhurst essentially believed, from his initial evaluation onward, that Plaintiff was exaggerating his symptoms and giving poor effort on testing. However, he continued to prescribe Oxycodone and morphine for Plaintiff's complaints of pain.
50. After reviewing some of the surveillance footage, Dr. Broadhurst came to the conclusion that Plaintiff was "purposely misleading" him about his abilities.
51. Despite his earlier opinion based upon the November 27, 2009 cervical MRI results that Plaintiff needed to be seen by another spine surgeon, after seeing the surveillance footage, Dr. Broadhurst felt that Plaintiff should be able to do work at the "medium" physical demand level. He believed that the permanent restrictions assigned by Dr. Hoski on October 5, 2007, were consistent with medium level work.
52. With respect to disability, Dr. Bender and Dr. Kalson wrote Plaintiff out of work throughout the period in which they provided treatment. As of February 23, 2006, Plaintiff was written out of work "pending call after 2nd opinion." At that time Dr. Kalson had recommended surgery and Plaintiff wanted a second opinion examination before considering surgery. It appears from the evidence that Plaintiff received this second opinion examination from Dr. Coric on March 30, 2010. Dr. Keem, an orthopedic surgeon who performed an independent medical examination of Plaintiff on March 16, 2006, agreed with Dr. Kalson's surgical recommendation. He recommended sedentary work restrictions. On October 5, 2007, Dr. Hoski opined that the main barrier to a return to work for Plaintiff was pain control. He assigned permanent work restrictions of no lifting more than 20 pounds, no pushing or pulling over 50 pounds, and only occasional bending, stooping, twisting, and climbing. On or about May 2010, Dr. Broadhurst indicated that he agreed with the restrictions given by Dr. Hoski, after reviewing surveillance videos, but felt these restrictions placed Plaintiff in the medium level work classification. *Page 14 
53. Considering the differing opinions of various medical experts on whether Plaintiff needed surgery, whether he was capable of working, or the level of work he could perform if he could work, the Full Commission is of the opinion that Plaintiff needs a Functional Capacity Evaluation to provide additional information on his level of functioning and that he remains disabled until further information is obtained.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On December 22, 2004 Plaintiff sustained a compensable injury by accident due to a fall from a height of 10 to 15 feet, resulting in five fractured ribs and in injuries to his neck and back. Although neither Plaintiff's neck condition, nor his low back condition has been accepted as compensable in this claim, Defendants have not contended that either condition is not related to the compensable accident that occurred on December 22, 2004, nor did they preserve any such issue in the pre-trial agreement. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has shown that he currently remains disabled. At a minimum, he remains under the permanent work restrictions assigned by Dr. Hoski on October 5, 2007, which consisted of no lifting more than 20 pounds, no pushing or pulling over 50 pounds, and only occasional bending, stooping, twisting, and climbing. Given Plaintiff's work related and non-work related physical limitations, his limited vocational and educational experience and the differing medical expert opinions on what his level of functioning is, it would be futile for him to seek work that comports with his physical restrictions until he can obtain a Functional capacity Evaluation to obtain further information on what his functional capacity is and whether he is at *Page 15 
maximum medical improvement. N.C. Gen. Stat. § 97-2(9);Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993).
3. Defendants' surveillance materials provide brief, sporadic snapshots of Plaintiff's life and comprise a miniscule percentage of the time that Plaintiff was being watched by the private investigator. The Full Commission concludes that they are not probative on the question of whether Plaintiff is malingering. As such, and because Plaintiff has shown that he remains disabled, Defendants are not entitled to have their Form 24 application approved. N.C. Gen. Stat. § 97-18.1; NCIC Rule 404.
4. Plaintiff is entitled to continue to receive TTD compensation. N.C. Gen. Stat. § 97-29.
5. Given that some of the specialists have recommended cervical and/or lumbar surgery for Plaintiff, the Full Commission cannot conclude that Plaintiff is at maximum medical improvement. Plaintiff remains entitled to such medical treatment as is reasonably required to effect a cure, provide relief and/or lessen the period of Plaintiff's disability. Defendants shall provide a Functional Capacity Evaluation for Plaintiff. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
6. Defendants have shown that the CT myelograms recommended by Dr. Coric are not related to his neck and/or low back conditions. As such, Plaintiff is not entitled to have Defendants pay for such testing. Id.
7. As Plaintiff has not had his work restrictions determined since they were assigned by Dr. Hoski in October of 2007, Plaintiff is to submit to a Functional Capacity Evaluation. Id.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following: *Page 16 
 AWARD
1. Defendants' December 22, 2009 Form 24 application is hereby DISAPPROVED, and Defendants SHALL continue to pay weekly TTD compensation to Plaintiff in the amount of $399.28 per week until Plaintiff returns to work or further Order of the Commission.
2. Defendants SHALL, subject to the limitations period of N.C. Gen. Stat. § 97-25.1, continue to provide Plaintiff with such medical treatment as is reasonably required to effect a cure, provide relief and/or lessen the period of Plaintiff's disability, including a Functional Capacity Evaluation.
3. Defendants are not required to authorize or pay for the CT myelograms recommended by Dr. Coric.
4. Defendants shall pay the costs.
This the 4th day of August, 2011.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________ STACI T. MEYER COMMISSIONER
 S/____________ LINDA CHEATHAM COMMISSIONER *Page 1